UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| VAL DINARDO, | CASE NO. C16-1600JLR |
| Plaintiff, | ORDER ON MOTION FOR |
| v. | SUMMARY JUDGMENT AND ORDER TO SHOW CAUSE |
| WOW 1 DAY PAINTING, LLC, | REGARDING COUNTERCLAIMS |
| Defendant. | |

## I. INTRODUCTION

Before the court is Defendant Wow 1 Day Painting, LLC's ("Wow") motion for summary judgment. (MSJ (Dkt. # 35).) The court has reviewed the motion, Plaintiff Val DiNardo's responsive memorandum (Resp. (Dkt. # 38)), all other submissions filed in support of or in opposition to the motion, the relevant portions of the record, and the applicable law. Being fully advised,[1] the court GRANTS the motion. The court also

---

[1] Neither party requests oral argument, and the court concludes that such argument would not be helpful to its disposition of Wow's motion. *See* Local Rule W.D. Wash. LCR 7(b)(2).

ORDERS the parties to show cause why Wow's counterclaims should not be dismissed without prejudice, as more fully described below.

## II.    BACKGROUND

Pursuant to a licensing agreement between Wow and its parent corporation, Wow 1 Day Painting, Inc. ("Wow Corporate"), Wow has an exclusive right and license to market, sublicense, franchise, and distribute certain federally registered United States trademarks, including the registered trademarks bearing Registration No. 4,143,638 (May 15, 2012), Registration No. 4,168,698 (July 3, 2012), Registration No. 6,644,008 (November 25, 2014), and Registration No. 4,644,097 (November 25, 2014).  (Alisch Decl. (Dkt. # 36) ¶ 2, 5, Exs 1, 4.)  Wow attests that it, in turn, sublicensed the federally registered trademarks to certain franchisees, including Mr. DiNardo.  (*Id.* ¶ 6.)

Wow and Mr. DiNardo executed a franchise agreement on May 21, 2014, that was effective on May 17, 2014 ("the Franchise Agreement").  (Graff Decl. (Dkt. # 37) ¶ 3, Ex. 2 ("Franchise Agreement").)  The Franchise Agreement offers a system of providing interior and exterior painting services in one day "using confidential methods, procedures, and business techniques."  (Compl. (Dkt. # 1-1) ¶¶ 6-7.)  Under the Franchise Agreement, Wow granted to DiNardo the right to use the registered United States trademarks—or "Marks" as defined in Recital B of the Agreement—"and related logos, designs, brands, and slogans as may be added or modified from time to time."  (Franchise Agreement at Recitals A-C, § 2.1.)

The Franchise Agreement expressly states that the term "Mark" is defined in Recital B.  (*Id.* § 2.1.)  Recital B states:

The distinguishing characteristics of the System currently include, but are not limited to, the registered U.S. trademarks shown in Schedule A and related logos, designs, brands and slogans as may be added or modified from time to time (collectively the "Marks") which are licensed to [Wow] by [Wow Corporate], . . . which [Wow] in turn licenses to [Mr. DiNardo] under the terms and conditions set forth herein.

(*Id.*, Recital B.)  Schedule A of the Agreement lists two Marks with registrations pending as of February 24, 2014, and February 25, 2014, respectively.  (*Id.*, Schedule A.)  These two Marks were ultimately registered on November 25, 2014, bearing the Registration Nos. 4,644,088 and 4,644,097, respectively.  (Alisch Decl. ¶ 5, Ex. 4 at 8-9.)

The Agreement contains the following integration clause:

**Entire Agreement**. Unless acknowledged and agreed in writing by both parties, this Agreement, all Security Agreements, and all Guarantees set forth the entire agreement between Franchisor and Franchisee and contain all of the representations, warranties, terms, conditions, provisos, covenants, undertakings and conditions agreed upon by them with reference to the subject matter hereof. All other representations, warranties, terms, conditions, provisos, covenants, understandings and agreements, whether oral or written (including without limitation any letter of intent between the parties and other pre-contractual representations), are waived and are superseded by this Agreement. However, nothing in this Agreement or related agreements is intended to disclaim any representation made by Franchisor in the franchise disclosure document furnished to Franchisee as required prior to entering into this Agreement.

(Franchise Agreement § 21.8.)

The Agreement also contains a choice of law provision:

**Governing Law**. This Agreement shall be construed and interpreted according to the laws of the state of Washington, except that no Washington statute or regulation shall apply or shall give rise to any right or claim unless the Territory is in the State of Washington and such statute or regulation would apply to this Agreement by its own terms in the absence of any choice of law provision. The King County Superior Court in Seattle or the U.S. District Court in Seattle, as appropriate, shall have exclusive jurisdiction to entertain any proceeding relating to or arising out of this Agreement, and

> Franchisee and Franchisor each consent to the jurisdiction of such Courts in all matters related to this Agreement; provided that Franchisor may obtain relief in such other jurisdictions as may be necessary or desirable to obtain declaratory, injunctive or other relief to enforce the provisions of this Agreement.

(*Id.* § 21.12.)

Mr. DiNardo admits that he executed the Agreement. (*Id.* ¶ 2, Ex. 1 ("DiNardo Dep.") at 56:7-57:1, 57:11-15; *see also* Compl. ¶ 14 ("[O]n May 21, 2014, [Mr. DiNardo] entered into a Franchise Agreement with [Wow] effective May 17, 2014.").) Mr. DiNardo testified in his November 9, 2017, deposition that he did not read the Agreement before signing it. (*Id.* at 58:5-7.) When asked why he did not read the Agreement, he stated he "was probably too busy, at the time, to read it over," and he "didn't really want to be bothered with it at the time." (*Id.* at 58:13-14, 18-19.)

Mr. DiNardo alleges that Wow made certain misrepresentations to him. (*See* Compl. ¶ 22.) During the discovery phase of the litigation, Wow asked Mr. DiNardo to identify "each and every false statement, omission, or representation" that underpinned his misrepresentation claim. (Graff Decl. ¶ 4, Ex. 3 (DiNardo's Responses to Wow's Interrogatories and Requests for Production) at 2-3 (Answer to Interrogatory No. 3).) In response to Wow's interrogatory, Mr. DiNardo stated:

> DiNardo should expect to make $300,000 in sales the first year and $400,000 in sales the second year. The margins include 10% for materials, 50% for labor, 11% for the franchise, with a goal of 30% as net profit. 2% would go to the National Ad Fund, which was supposed to fund national advertising. Lee Adler admitted that the money was used for the back office expense and not for advertising.

> [Wow] represented that it was offering a revolutionary system with trade secrets about how to paint a project in one day and would provide support

services to generate significant business for DiNardo, to as much as $3 million per year.

[Wow] represented that the new franchise would be significantly marketed by Wow 1 Day Painting, LLC in the State of Connecticut, and such marketing efforts would include use of their call center operations and internet operations, resulting in new business opportunities based on its innovative business concept.

[Wow] represented that it would be dramatically expanding its presence in the Northeastern United of States, to include the State Connecticut.

(*Id.*) Mr. DiNardo did not list any other alleged misrepresentations. (*See id.*) During his November 9, 2017, deposition, Mr. DiNardo admitted that Wow made each of the foregoing alleged misrepresentations after Mr. DiNardo had entered into the Agreement. (DiNardo Dep. at 114:23-122:10.)

In response to Wow's motion for summary judgment, Mr. DiNardo filed an affidavit in which he testifies that he relied on misrepresentations in the Agreement itself "when deciding to enter into the . . . Agreement." (DiNardo Aff. (Dkt. # 39) ¶ 18.) Mr. DiNardo also testifies in his affidavit that Wow's representatives made alleged misrepresentations prior to his execution of the Agreement and that he relied on those misrepresentations. (*See id.* ¶¶ 11-17.) He also states that "Wow . . . never discussed with [him] any Marks beyond those listed in Schedule A [of the Agreement]," and "never granted the right to use any of the registered trademarks claimed held or licensed to [Wow] . . . at or after the signing of the . . . Agreement." (*Id.* ¶¶ 43-44.)

Mr. DiNardo stopped operating his franchise in October or November 2015. (DiNardo Aff. ¶ 45.) In May 2016, Mr. DiNardo filed suit against Wow. (*See generally* Compl.) Wow removed Mr. DiNardo's suit to federal court (Not. of Removal (Dkt. # 1)),

and the federal district court in Connecticut subsequently transferred the suit to this district (*see* Dkt. # 18).

Mr. DiNardo asserts claims against Wow in state court in Connecticut for (1) intentional misrepresentation (*see* Compl. ¶ 22[2]), (2) violation of Connecticut's Unfair Trade Practices Act ("UTPA"), Conn. Gen. Stat. §§ 42-110b(a) (*see* Compl. ¶ 20), and (3) violations of Connecticut's Business Opportunity Investment Act ("BOIA"), Conn. Gen. Stat. §§ 36b-60, 36b-74(a) (*see* Compl. ¶ 22[3]). Wow countersued bringing claims against Mr. DiNardo for breach of contract and payment of accounts receivable. (Ans. & Counterclaims (Dkt. # 21) at 5-9.) Wow seeks both damages and an injunction prohibiting Mr. DiNardo from further alleged violations of the non-competition provisions of the Agreement. (*See id.*)

### III. ANALYSIS

Wow moves for summary judgment on all of Mr. DiNardo's claims. (*See* MSJ; Reply (Dkt. # 41).) The court now considers Wow's motion.

**A. Standard for Summary Judgment**

Summary judgment is appropriate if the evidence shows "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Galen v. Cty. of L.A.*, 477 F.3d 652, 658 (9th Cir. 2007). A fact is "material" if it might affect the

---

[2] The complaint contains two paragraphs 22. (*See* Compl. at 6.) This reference is to the first paragraph 22 on page six of the complaint.

[3] This reference is to the second paragraph 22 on page six of the complaint.

outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A factual dispute is "'genuine' only if there is sufficient evidence for a reasonable fact finder to find for the non-moving party." *Far Out Prods., Inc. v. Oskar*, 247 F.3d 986, 992 (9th Cir. 2001) (citing *Anderson*, 477 U.S. at 248-49).

The moving party bears the initial burden of showing there is no genuine dispute of material fact and that it is entitled to prevail as a matter of law. *Celotex*, 477 U.S. at 323. If, like Wow, the moving party does not bear the ultimate burden of persuasion at trial, it can show the absence of such a dispute in two ways: (1) by producing evidence negating an essential element of the nonmoving party's case, or (2) by showing that the nonmoving party lacks evidence of an essential element of its claim or defense. *See Nissan Fire & Marine Ins. Co. v. Fritz Cos.*, 210 F.3d 1099, 1106 (9th Cir. 2000). If the moving party meets its burden of production, the burden then shifts to the nonmoving party to identify specific facts from which a fact finder could reasonably find in the nonmoving party's favor. *Celotex*, 477 U.S. at 324; *Anderson*, 477 U.S. at 252.

The court is "required to view the facts and draw reasonable inferences in the light most favorable to the [nonmoving] party." *Scott v. Harris*, 550 U.S. 372, 378 (2007). The court may not weigh evidence or make credibility determinations in analyzing a motion for summary judgment because those are "jury functions, not those of a judge." *Anderson*, 477 U.S. at 249-50. Nevertheless, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts . . . . Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." *Scott*, 550 U.S. at 380 (internal

1  quotation marks omitted) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,

2  475 U.S. 574, 586-87 (1986)).

3  **B.    Choice of Law**

4        At the outset, the court must determine which state law applies to each of Mr.

5  DiNardo's claims.  Wow asserts that the contractual choice of law provision in the

6  Franchise Agreement governs Mr. DiNardo's claims, and thus, Washington law applies

7  to all of the claims.  (MSJ at 5.)  Mr. DiNardo, however, argues that Connecticut law

8  applies to his statutory claims.  (Resp. at 7-11.)  In Washington, "a choice of law

9  provision in a contract does not govern tort claims arising out of the contract."

10  *Haberman v. Wash. Pub. Power Supply Sys.*, 744 P.2d 1032, 1066 (Wash. 1987).  Mr.

11  DiNardo has not asserted a claim for breach of contract.  (*See generally* Compl.)  Thus,

12  the choice of law provision in the Agreement is not determinative of the law that the

13  court should apply to Mr. DiNardo's claims.

14        In suits arising under the court's diversity jurisdiction, the court must determine

15  whether to apply the law of the forum state or the law of another state.  *See Kohlrautz v.*

16  *Oilmen Participation Corp.*, 441 F.3d 827, 833 (9th Cir. 2006).  To make this

17  determination, the court applies the choice of law rules of the forum state.  *Id*.

18  Washington employs a two-step approach to choice of law questions.  First,

19  Washington's choice of law principles require the application of Washington law unless

20  there is an "actual conflict" with another applicable body of law.  *Burnside v. Simpson*

21  *Paper Co*., 864 P.2d 937, 942 (Wash. 1994).  Second, if there is a conflict, Washington

22  //

uses a "most significant relationship" test.[4]  *See Rice v. Dow Chem. Co.*, 875 P.2d 1213, 1217 (Wash. 1994).

For tort and similar statutory claims, the "most significant relationship" test focuses on the place where the tortious conduct occurred, the place where the injury occurred, the residences of the parties, and the place in which the parties' relationship is "centered."  *Id.* (citing Restatement (Second) of Conflicts of Laws § 145 for tort and CPA claims); *see MKB Constructors v. Am. Zurich Ins. Co.*, 49 F. Supp. 3d 814, 832 (W.D. Wash. 2014) ("Washington courts follow the Restatement (Second) of Conflicts of Laws § 145 to determine which state's law governs tort, IFCA, and CPA claims.") (citing *Tilden-Coil Constructors, Inc. v. Landmark Am. Ins. Co.*, 721 F. Supp. 2d 1007, 1016 (W.D. Wash. 2010) (analyzing choice of law for tort and CPA claims) and *Polygon Nw. Co. v. Nat'l Fire & Marine Ins. Co.*, No. 11-92Z, 2011 WL 2020749 (W.D. Wash. May 24, 2011) (analyzing choice of law for IFCA and CPA claims)).  As the party seeking the application of another state's law, Mr. DiNardo bears the burden of demonstrating that a conflict exists.  *Nichols v. Fed. Deposit Ins. Corp.*, No. C14-1796RSM, 2016 WL 696389, at *3 (W.D. Wash. Feb. 22, 2016) (citing *Burnside v. Simpson Paper Co.*, 864 P.2d 937, 942 (Wash. 1994)).  The court applies these principles to each claim.

//

//

//

---

[4] An "actual conflict" exists between Washington law and the laws or interests of another state if application of the various states' laws could produce diverging outcomes on the same legal issue.  *Erwin v. Cotter Health Ctrs.*, 167 P.3d 1112, 1120 (Wash. 2007).

1     1.  Misrepresentation

2          Mr. DiNardo never asserts a conflict between Washington and Connecticut law

3     regarding his misrepresentation claim.  (*See generally* Compl.)  In fact, Mr. DiNardo

4     impliedly admits that Washington law applies to his misrepresentation claim by only

5     citing Washington law in support of that claim.  (*See* Resp. at 15.)  Accordingly, the court

6     applies Washington law to Mr. DiNardo's misrepresentation claim.

7     2.  UTPA

8          Mr. DiNardo asserts that an actual conflict exists between the laws of Washington

9     and Connecticut concerning his claim under Connecticut's UTPA because Washington

10    does not have such a statute.  (*See* Resp. at 9.)  Wow counters that Connecticut's UTPA

11    is comparable to Washington's Consumer Protection Act ("CPA") and that there is no

12    actual conflict between the two statutes as applied to Mr. DiNardo's claim.  (Reply at 5.)

13    The court agrees with Wow.  First, the statutes are analogous and serve the same public

14    policy concerns.  Connecticut's UTPA provides that "[n]o person shall engage in unfair

15    methods of competition and unfair or deceptive acts or practices in the conduct of trade

16    or commerce."  Conn. Gen. Stat. § 42-110b.  Similarly, Washington's CPA provides that

17    '[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct

18    of any trade or commerce are hereby declared unlawful.'  RCW 19.86.020.  Further, the

19    UTPA provides that "[a]ny person who suffers any ascertainable loss of money or

20    property, real or personal, as a result of the use or employment of a method, act or

21    practice prohibited by [the UTPA], may bring an action . . . ."  Conn. Gen. Stat.

22    § 42-100g.  Likewise, under the CPA, "[a]ny person who is injured in his or her business

or property by a violation of [the CPA] . . . may bring a civil action . . . ." RCW

19.86.090. Under both Acts, injured parties are entitled to damages and injunctive relief.

Conn. Gen. Stat. § 42-100g; RCW 19.867.090.

More specifically, the outcome of Wow's motion for summary judgment on Mr.

DiNardo's UTPA claim is the same regardless of whether the court considers it under

Connecticut or Washington law. *See Erwin*, 167 P.3d at 1120. Mr. DiNardo's claim

under the UTPA relies solely on his allegations of misrepresentation. (*See* Compl. ¶ 20

("The conduct of [Wow] alleged in this Count constitutes a deceptive act or practice

within the meaning of [UPTA] . . . in that said conduct constitutes a material

misrepresentation . . . likely to mislead a person acting reasonably under the

circumstances."). The crux of Wow's motion for summary judgment concerning Mr.

DiNardo's UTPA claim is that Mr. DiNardo cannot prove that any alleged

misrepresentation was the proximate cause of his harm. (*See* Reply at 4.) To support a

claim under either Connecticut's UTPA or Washington's CPA, the plaintiff must prove

that the defendant's alleged misrepresentation was the proximate cause of the plaintiff's

injury. In Connecticut, proof of intentional or negligent misrepresentation will support an

UTPA claim where the "alleged misrepresentation was the proximate cause of [the

plaintiff's] injury." *McCann Real Equities Series XXII, LLC v. David McDermott

Chevrolet, Inc.*, 890 A.2d 140, 162 (Conn. Ct. App. 2006); *see also Pellet v. Keller

Williams Realty Corp.*, 172 A.3d 283, 298 (Conn. Ct. App. 2017) (holding that an

"essential element" of a cause of action under UTPA is that "the prohibited act was the

proximate cause of harm to the plaintiff"). Likewise, in Washington, "where a defendant

1    engaged in an unfair or deceptive act [under the CPA], and there has been an affirmative

2    misrepresentation of fact, . . . there must be some demonstration of a causal link between

3    the misrepresentation and the plaintiff's injury." *Indoor Billboard/Washington, Inc. v.*

4    *Integra Telecom of Wash.*, 170 P.3d 10, 22 (Wash. 2007); *see also Deegan v.*

5    *Windermere Real Estate/Ctr.-Isle, Inc.*, 391 P.3d 582, 587 (Wash. Ct. App. 2017).  Thus,

6    the court concludes that there is no "actual conflict" between Connecticut and

7    Washington law because the outcome will not diverge irrespective of which law the court

8    applies.  *See Erwin*, 167 P.3d at 1120.  Accordingly, the court applies Washington law to

9    Wow's motion for summary judgment on this claim.

10        3.  <u>BOIA</u>

11        Next, the court considers the choice of law concerning Wow's motion for

12   summary judgment on Mr. DiNardo's claims under the BOIA.  Washington does not

13   have a statute comparable to Connecticut's BOIA, and thus, Mr. DiNardo argues that an

14   actual conflict exists with respect to his claims under that Act.  (Resp. at 9.)  Wow does

15   not identify a comparable Washington statute or otherwise respond to this argument in its

16   reply.  (*See generally* Reply.)  Further, Wow appears to admit that Connecticut law

17   applies to Mr. DiNardo's claim under the BOIA by citing only Connecticut law in

18   opposition to this claim.  (*See id.* at 6-7.)  Because Washington does not have a statue

19   comparable to Connecticut's BOIA, the court concludes that an actual conflict exists with

20   respect to Mr. DiNardo's claims under this statute.

21        The court also concludes that under Washington's most significant relationship

22   test, Connecticut law applies to Mr. DiNardo's BOIA claims.  The court first considers

the place where the alleged tortious conduct occurred. *See Rice*, 875 P.2d at 1217. The record does not indicate where the parties executed the Franchise Agreement or where Wow made the alleged misrepresentations. However, Mr. DiNardo is a resident of Connecticut (Compl. ¶ 1), and after executing the Franchise Agreement, he operated his franchise business there (*see* Franchise Agreement § 2.2, Schedule B). Mr. DiNardo also traveled to Vancouver, British Columbia, Canada, to discuss Wow's franchise opportunity (DiNardo Aff. ¶ 10) and attended training sessions there after he executed the Franchise Agreement (*id.* ¶ 19). Despite the fact that Wow is a Washington limited liability company (*see* Compl. ¶ 4), there is no indication in the record that any of the alleged tortious conduct occurred in Washington. Based on the limited record before it, the court concludes that the alleged tortious conduct occurred in British Columbia and Connecticut.

The next factor the court considers is the location of the alleged injury. *Rice*, 875 P.2d at 1217. The court concludes that Mr. DiNardo's injury occurred in Connecticut because he operated his franchise business there and thus would have incurred his losses and damages there. (*See* Franchise Agreement § 2.2, Schedule B (describing franchise territory in Connecticut).)

Another factor the court considers is the parties' residences. *See Rice*, 875 P.2d at 1217. Wow is a Washington limited liability company, whose sole member is a business that is incorporated in British Columbia, Canada. (Ans. & Counterclaims at 5.) Further, Wow's principal place of business is in British Columbia. (*Id.*) Mr. DiNardo, however,

is a resident of Connecticut. (*Id.* at 6; Compl. ¶ 1.) Thus, the court concludes that this factor is split between Washington, British Columbia, and Connecticut.

Finally, the court considers where the relationship of the parties is centered. *Rice*, 875 P.2d at 1217. The court concludes that this factor is split between British Columbia and Connecticut. As noted above, Mr. DiNardo operated his franchise in Connecticut pursuant to the parties' Franchise Agreement (*see* Franchise Agreement § 2.2, Schedule B), but traveled to British Columbia to discuss the franchise opportunity with Wow's representatives prior to executing the Franchise Agreement (DiNardo Aff. ¶ 10), and traveled there again to participate in Wow's trainings subsequent to executing the Franchise Agreement (*id.* ¶ 19).

On balance, the court concludes that Connecticut law applies to Mr. DiNardo's claims under Connecticut's Business Opportunity Investment Act. The first, third, and fourth factors in Washington's most significant relationship test are primarily split between British Columbia and Connecticut. The second factor, however, the location of the alleged injury, is in Connecticut. No factor favors the application of Washington law. Considering the totality of the factors, the court applies Connecticut law to Mr. DiNardo's BOIA claims.[5]

//

//

---

[5] No party urged the application of British Columbia law. (*See* MSY; Resp.; Reply.) Even if one of the parties had sought the application of British Columbia law, the court would have still concluded that Connecticut law applies to Mr. DiNardo's BOIA claims due to the court's analysis of the relevant factors above.

**C.    Wow's Motion for Summary Judgment of the Misrepresentation Claim**

To prevail on either a negligent or intentional misrepresentation claim, Mr. DiNardo must prove by clear, cogent, and convincing evidence that he relied on the alleged misrepresentation. *See Elcon Constr., Inc. v. E. Wash. Univ.*, 273 P.3d 965, 970 (Wash. 2012) (listing elements, including reliance, for intentional misrepresentation or fraud); *Ross v. Kirner*, 172 P.3d 701, 704 (Wash. 2007) (listing elements, including reliance, for negligent misrepresentation).  Although reliance is ordinarily a question of fact, summary judgment is appropriate if reasonable minds could reach but one conclusion on the issue. *Cornerstone Equip. Leasing, Inc. v. MacLeod*, 247 P.3d 790, 794 (Wash. 2011).

Wow argues that Mr. DiNardo cannot prove this element because he testified in his deposition that all of the alleged misrepresentations occurred after he had entered into the Franchise Agreement.   (MSJ at 9 (citing DiNardo Dep. at 114:23-122:10; Franchise Agreement).)  Wow also asserts, based on Mr. DiNardo's interrogatory response, that he did not allege any misrepresentation in the Franchise Agreement itself. (*Id.* at 10.)  As a result, Wow argues that it is entitled to summary judgment on Mr. DiNardo's misrepresentation claim.

In response, Mr. DiNardo does not argue that he can somehow rely on statements attributed to Wow after he entered into the Franchise Agreement.  Instead, Mr. DiNardo now claims that Wow made misrepresentations to him "during initial meetings and telephone conversations prior to the signing of the Franchise Agreement." (Resp. at 2.) In support of these arguments, Mr. DiNardo submits an affidavit in which he details the

misrepresentations he states occurred prior to the execution of the Franchise Agreement. (DiNardo Aff. ¶¶ 11-18.) In this same affidavit, he also states that "[t]he Franchise Agreement itself made representation . . . which I relied upon when deciding to enter into the Franchise Agreement." (*Id.* ¶ 19.) Mr. DiNardo's argument fails for two reasons.

First, Mr. DiNardo is forestalled from asserting that he relied upon any alleged misrepresentation in the Franchise Agreement itself. During his deposition, he testified that he did not read the Franchise Agreement prior to signing it. (DiNardo Dep. at 58:5-7.) Because Mr. DiNardo did not read the Agreement, the court concludes that Mr. DiNardo cannot demonstrate by clear, cogent, and convincing evidence that he relied on any alleged misrepresentation in the Franchise Agreement itself. *See Elcon Constr., Inc.*, 273 P.3d at 970.

Second, based on the "sham" affidavit rule, Mr. DiNardo cannot rely on statements he now asserts about alleged misrepresentations Wow made prior to executing the agreement. Specifically, Mr. DiNardo cannot submit an affidavit that contradicts his prior deposition testimony for the purpose of manufacturing an issue of fact to defeat Wow's motion for summary judgment. *See Kennedy v. Allied Mut. Ins. Co.*, 952 F.2d 262, 266 (9th Cir. 1991) ("The general rule in the Ninth Circuit is that a party cannot create an issue of fact by an affidavit contradicting his prior deposition testimony."). The reason for this rule is that "[i]f a party who has been examined at length on deposition could raise an issue of fact simply by submitting an affidavit contradicting his own prior testimony, this would greatly diminish the utility of summary judgment as a procedure for screening out sham issues of fact." *Id.* Nevertheless, the Ninth Circuit cautions that

this rule should be "applied with caution." *Van Asdale v. Int'l Game Tech.*, 577 F.3d 989, 998 (9th Cir. 2009). Specifically, "the inconsistency between a party's deposition testimony and subsequent affidavit must be clear and unambiguous," and the court must "make a factual determination that the contradiction was actually a 'sham.'" *Id.* at 998-99. Thus, "the non-moving party is not precluded from elaborating upon, explaining or clarifying prior testimony elicited by opposing counsel on deposition and minor inconsistencies that result from an honest discrepancy, a mistake, or newly discovered evidence afford no basis for excluding an opposition affidavit." *Id.* (internal alterations omitted) (quoting *Messick v. Horizon Indus.*, 62 F.3d 1227, 1231 (9th Cir. 1995)).

The court has examined both Mr. DiNardo's deposition testimony and his later affidavit. During Mr. DiNardo's deposition, Wow's counsel carefully asked Mr. DiNardo about each of the alleged misrepresentations listed in his interrogatory response and the timing of those alleged misrepresentations. (*See* DiNardo Dep. at 114:23-122:10; *see also* Graff Decl. ¶ 4, Ex. 3 at 2-3.) In each instance, Mr. DiNardo specifically identified the time period in which the alleged misrepresentation happened as occurring after May 21, 2014—the day he executed the Franchise Agreement.[6] Nevertheless, in his

---

[6] For example, with respect to the first misrepresentation Mr. DiNardo identified in his interrogatory response, he testifies as follows:

Q: And that was in the summer or spring of 2015?
A: Yes, I believe it was, unless it was in the fall of 2014. I can't recall if it was in the beginning—in the fall or in the spring.
Q: Either late 2014 or spring 2015?
A: Yes.

\*\*\*\*\*\*\*\*\*\*\*

1  subsequently filed affidavit, Mr. DiNardo states an entirely new and much earlier time

2  period for Wow's alleged misrepresentations than the time period to which he testifies in

4  Q: So is—the second sentence of that first paragraph and your response to interrogatory number three . . . Is that referring also to statements . . . in the fall of 2014 or spring of 2015?
   A: Yes.
   Q: . . . How about the same questions with the next sentence . . . ?
   A: Yes.
   Q: Same time?
   A: Yes.

8  (DiNardo Dep. at 115:24-116:5, 116:10-23.)  Concerning the timing of the second misrepresentation Mr. DiNardo identified in his interrogatory response, he testified as follows:

   Q: Was this all in the same time period during the July and August training –
   A: Yes.
   Q: -- in Vancouver?
   A: Yes.

11 (*Id.* at 119:7-11; *see also id.* at 118:18-23.)  Concerning the timing of the third misrepresentation Mr. DiNardo identified in his interrogatory response, he testified as follows:

   Q: Okay.  And, again, were those conversations occurring with you, Mr. Dinardo, during the Vancouver trainings in July and August 2014?
   A: Yes.

15 (*Id.* at 121:18-21.)  Concerning the timing of the last misrepresentation Mr. DiNardo identified in his interrogatory response, he testified as follows:

   Q: Again, were those statements made during the July and August 2014 trainings . . . ?
   A: Yes.

18 (*Id.* at 122:1-4.)  Finally, Mr. DiNardo again confirmed that all of the misrepresentations asserted in his interrogatory response occurred prior to the execution the Franchise Agreement:

   Q: Okay.  So all of the—all of the representations you've identified then in interrogatory number three were made . . . during the months of July or August 2014, while you were in training?
   A: Yes.

22 (*Id.* at 122:5-10.)

his deposition.  (*Compare* DiNardo Aff. ¶¶ 11-17 *with* DiNardo Dep. at 114:23-122:10.)

In his affidavit, Mr. DiNardo asserts for the first time that Wow made misrepresentations

to him prior to his execution of the Franchise Agreement.  (*See* DiNardo Aff. ¶¶ 11-17.)

Despite these inconsistencies, nowhere in his affidavit does Mr. DiNardo attempt to

"elaborate[e] upon, explain[], or clarify[]" his prior deposition testimony.  *See Van*

*Asdale*, 577 F.3d at 998-99.  Indeed, he does not reference his deposition testimony at all.

(*See generally* DiNardo Aff.)  Based on the foregoing, the court concludes that Mr.

DiNardo's affidavit was submitted for the purpose of manufacturing an issue of fact to

defeat Wow's motion for summary judgment and is, therefore, a sham.  Mr. DiNardo

cannot rely on his affidavit to defeat this portion of Wow's motion for summary

judgement, and accordingly, the court grants Wow summary judgment on Mr. DiNardo's

misrepresentation claim.

**D.     UTPA Claim**

Mr. DiNardo's UTPA claim rests solely on his allegations of misrepresentation.

(*See* Compl. ¶¶ 1-21.)  As noted above, the court applies Washington's law under the

CPA to this claim because the court concluded that there was no actual conflict between

the laws of Connecticut and Washington with respect to the issue presented in Wow's

motion for summary judgment.  *See supra* § III.B.2.  Under either statute, Mr. DiNardo

must show that his harm is proximately caused by Wow's alleged misrepresentation.  *See*

*id.*  In other words, "[a] plaintiff must establish that, but for the defendant's unfair or

deceptive practice, the plaintiff would not have suffered an injury."  *Indoor*

*Billboard/Washington*, 170 P.3d at 22; *see also Schnall v. AT&T Wrieless Servs., Inc.*,

259 P.3d 129, 137 (Wash. 2011) (noting that Washington Supreme Court "established" that "but for" proximate causation applies to a CPA claim "based on an affirmative misrepresentation."). Because Mr. DiNardo testified that all of the alleged misrepresentations occurred after he executed the Franchise Agreement, because he testified that he did not read the Franchise Agreement prior to signing it, and because the court disregards his subsequently filed affidavit to the contrary, *see supra* § III.C., Mr. DiNardo cannot demonstrate that his damages were proximately caused by Wow's alleged misrepresentations. In other words, he cannot demonstrate that but for Wow's misrepresentations, he would not have suffered an injury. Accordingly, the court grants Wow's motion for summary judgment on this claim as well.

**E.    BOIA Claims**

Mr. DiNardo asserts claims against Wow based on Sections 36b-62, 36b-63, and 36b-67 of Connecticut's BOIA. (*See* Compl. ¶ 22 (citing Conn Gen. Stat. §§ 36b-62, 36b-63, and 36b-67).) Wow argues that it is exempt from these claims because the BOIA expressly states, in pertinent part, that "sections 36b-60 to 36b-80 [of BOIA], inclusive, shall not apply to the sale of a marketing program made in conjunction with the licensing of a registered trademark or service mark, provided . . . such trademark or service mark has been effectively registered under federal law." Conn. Gen. Stat. § 36b-61(2); (*see also* MSJ at 5-6.)

Mr. DiNardo responds that Wow is not entitled to rely on this exemption because the Franchise Agreement "only permitted the use of pending trademarks, <u>not</u> the use of other licensed trademarks." (Resp. at 14 (emphasis in original).) In particular, Mr.

1  DiNardo asserts that Wow provided him access to only two Marks—both of which were

2  not yet registered and did not become registered until approximately six months after Mr.

3  DiNardo signed the Franchise Agreement.[7]  (*See id.* at 13.)

4        As noted above, Schedule A specifically lists two Marks—both of which are

5  expressly described as "Status:  Registration Pending."  (*Id.*, Schedule A.)  The United

6  States Patent and Trademark Office ultimately registered these two Marks on November

7  25, 2014, with Registration Nos. 4,644,088 and 4,644,097.  (Alisch Decl. ¶ 5, Ex. 4.)

8  The parties executed the Franchise Agreement on May 21, 2014, and Mr. DiNardo

9  operated the franchise until October or November of 2015.  (*See* Franchise Agreement,

10  Signature Pages; Compl. ¶ 15; DiNardo Aff. ¶ 45.)

11        In addition to the foregoing two Marks, Wow Corporate also licensed the

12  registered trademarks bearing Registration Nos. 4,143,638 and 4,168,698 to Wow.

13  (Alisch Decl. ¶ 5, Ex. 4.)  The latter two Marks, although not expressly listed in the

14  Franchise Agreement, were registered before the execution of the Franchise Agreement.

15  (*See id.*; *see also* Franchise Agreement.)

16        Mr. DiNardo's argument that Wow only granted him license to use of the

17  trademarks with pending registrations listed in Schedule A is belied by the plain language

18  of the Franchise Agreement.  The Franchise Agreement defines the term "Mark,"

19  collectively, as "[t]he distinguishing features of the System," which "currently include,

20  but are not limited to, the registered trademarks shown in Schedule A and related logos,

21

22        [7] Mr DiNardo fails to argue that the exemption in section 36b-61(2) of the BOIA does not apply for any other reason.  (*See generally* Resp.)

designs, brands and slogans as may be added or modified from time to time." (Franchise Agreement, Recital B.) Mr. DiNardo does not dispute that Wow Corporate licensed to Wow the registered trademarks bearing Registration Nos. 4,143,638 and 4,168,698. (Alisch Decl. ¶ 5, Ex. 4.) The Franchise Agreement also states that the Marks, which are licensed to Wow by Wow Corporate are, in turn, licensed by Wow to Mr. DiNardo. (*See* Franchise Agreement, Recital B (stating that the Marks "are licensed to [Wow] by . . . [Wow Corporate] . . . , which Marks [Wow] in turn licenses to [Mr. DiNardo] under the terms and conditions set forth herein.")); *see also id.*, Recital C ("The System includes, but is not limited to, use and promotion of the Marks . . . to enable franchisees to compete in the market for painting services.").)

Mr. DiNardo attempts to create an issue of fact by submitting an affidavit stating that he "was never granted the right to use any of the registered trademarks claimed held or licensed to [Wow] . . . after the signing of the Franchise Agreement," and that Wow "never discussed with [him] any Marks beyond those listed in Schedule A." (*See* DiNardo Aff. ¶¶ 44-45.) Although Mr. DiNardo may not have used any Marks beyond those listed in Schedule A (*see id.* ¶¶ 42-43), this does not mean he did not receive a license to other trademarks. Indeed, as noted above, the language of the Licensing Agreement states that he did. (*See* Franchise Agreement, Recital B.)

Mr. DiNardo may not create an issue of fact by providing parol evidence that contradicts or varies the plain language of the Franchise Agreement. In effect, though his affidavit, Mr. DiNardo attempts to eliminate the words in the Franchise Agreement that state that the Marks "include, but are not limited to" the Marks shown in Schedule A.

(*See* Franchise Agreement, Recital B.)  Under Washington law, extrinsic evidence may

be used whether or not contract language is ambiguous.[8]  *U.S. Life Ins. Co. v. Williams*,

919 P.2d 594, 597 (Wash. 1996) (citing *Berg v. Hudesman*, 801 P.2d 222, 230 (Wash.

1990)).  However, extrinsic evidence must be used to illuminate what was written, not

what was intended to be written.  *Hollis v. Garwall, Inc.*, 974 P.2d 836, 843 (Wash. 1999)

(citing *Nationwide Mut. Fire Ins. Co. v. Watson*, 840 P.2d 851, 857 (Wash. 1992)).  Thus,

extrinsic evidence may not be used (1) to establish a party's unilateral or subjective intent

as to the meaning of a contract word or term; (2) to show an intention independent of the

instrument; or (3) to vary, contradict, or modify the written word.  *W. Wash. Corp. of

Seventh-Day Adventists v. Ferrellgas, Inc.*, 7 P.2d 861, 866 (Wash. Ct. App. 2000).  As

described above, Mr. DiNardo attempts to use portions of his affidavit to vary, modify or

contradict the terms of the Franchise Agreement.

Because Mr. DiNardo uses portions of his affidavit in an attempt to contradict or

vary the language of the integrated Franchise Agreement, the court does not consider

those portions of his affidavit in response to Wow's motion for summary judgment.  *See

William G. Hulbert, Jr. & Clare Mumford Hulbert Revocable Living Tr. v. Port of

Everett,* 245 P.3d 779, 784 (Wash. Ct. App. 2011) ("Extrinsic evidence may not,

however, be used to show an intention independent of the instrument or to vary,

contradict or modify the written word." (internal quotation marks omitted)); *In re Mastro*,

---

[8] Based on the choice of law provision in the Franchise Agreement, the court applies
Washington law to this issue of contract interpretation.  (*See* Franchise Agreement § 21.12
("This Agreement shall be construed and interpreted according to the laws of the state of
Washington . . . .").

No. BAP WW-10-1142-MKHJU, 2011 WL 3300140, at *5 (B.A.P. 9th Cir. May 10, 2011) (citing *Hearst Commc'ns Inc. v. Seattle Times Co.*, 115 P.3d 262, 270 & n.14 (Wash. 2005)) (stating that, under *Hearst*, the court may not consider extrinsic evidence if the contract language is not reasonably susceptible to the meaning that the proffering party attempts to attribute to it).

The plain language of the Franchise Agreement states that the Marks that Wow licensed to Mr. DiNardo "included, but are not limited to" the Marks listed in Schedule A. (Franchise Agreement, Recital B.) The additional Marks, which relate to the franchise system and were licensed under the Franchise Agreement from Wow Corporate to Wow and in turn to Mr. DiNardo (*see* Franchise Agreement, Recital B) included at least two trademarks that were registered at the time the parties executed the Franchise Agreement (Alisch Decl. ¶ 5, Ex. 4). These facts entitle Wow to summary judgment on Mr. DiNardo's BOIA claims because Wow falls within the exemption found in Section 36-61(2). *See* Conn. Gen. Stat. § 36b-61(2); *see also Dice v. City of Montesano*, 128 P.3d 1253, 1257 (Wash. Ct. App. 2006) ("Interpretation of an unambiguous contract is a question of law, thus summary judgment is appropriate."). Thus, the court grants Wow's motion for summary judgment to Wow on Mr. DiNardo's BOIA claims.

**F.      Order to Show Cause on Counterclaims**

Although the court has granted summary judgment to Wow on all of Mr. DiNardo's claims, *see supra* § III.C., D., E., Wow's counterclaims against Mr. Dinardo remain (*see* Ans. & Counterclaims). Wow alleges that the court has subject matter jurisdiction over its counterclaims based on diversity jurisdiction. (*Id.*, Counterclaims

¶ 4.)  Although there is complete diversity of citizenship between the parties, Wow has

pleaded less than $75,000.00 in damages.  (*See id.* ¶ 12 ("As of October 2016, and under

the foregoing agreements, Dinardo is indebted to Wow in the amount of at least

$10,992.54, which amounts are due and payable."); *see also id.* ¶ 20 (alleging an identical

amount).)  In addition to $10,992.54 in damages, Wow alleges that it is entitled to

injunctive relief "ensuring that Dinardo is not . . . breaching the non-competition

provisions of the Franchise Agreement and/or using confidential or proprietary

information of Wow."  (*Id.* ¶ 28.)  However, there is no information before the court

concerning the value of Wow's requested injunctive relief.  (*See generally id.*)  Thus, the

court cannot conclude that the jurisdictional amount is met and that an independent basis

for the court's subject matter jurisdiction exists.

Nevertheless, because Wow's counterclaims are compulsory,[9] the court has

discretion to retain jurisdiction over the counterclaims regardless of whether there is an

independent basis for subject matter jurisdiction.  *Hamilton v. Firestone Tire & Rubber

Co.*, 679 F.2d 143, 146 n.3 (9th Cir. 1982).  When a case loses its federal substance, the

court may decline jurisdiction over the remaining state law compulsory counterclaims.  *In

re Nucorp Energy Securities Litig.*, 772 F.2d 1486, 1491 (9th Cir. 1985).  Considerations

of "judicial economy, convenience and fairness to the litigants" factor into the court's

decision to exercise supplemental jurisdiction.  *Id.* (citing *Hagans v. Lavine*, 415 U.S.

---

[9] A compulsory counterclaim "arises out of the same transaction or occurrence that is the subject of the opposing party's claims."  Fed. R. Civ. P. 13(a).  Wow's counterclaims arise out of the same Franchise Agreement at issue in Mr. DiNardo's claims.  (*See* Ans. & Counterclaims, Counterclaims ¶¶ 1-28.)

528, 546 (1974)).  Accordingly, the court orders the parties to show cause why Wow's counterclaims should not be dismissed without prejudice to possible re-filing in state court.[10]  The court orders the parties to file simultaneous responses to the court's order to show cause no later than January 31, 2018.  The parties shall limit their responses to no more than five (5) pages.

## IV.    CONCLUSION

Based on the foregoing analysis, the court GRANTS Wow's motion for summary judgment on all of Mr. DiNardo's claims (Dkt. # 35).  The court also ORDERS the parties to show cause why Wow's compulsory counterclaims should not be dismissed without prejudice.  The court ORDERS the parties to file its responses to the court's order to show cause no later than January 31, 2018, and to limit their responses to no more than five (5) pages.

Dated this 23rd day of January, 2018.

_____

JAMES L. ROBART
United States District Judge

---

[10] Although Wow removed this action from state court, the court cannot remand the action to state court because the federal district court in Connecticut transferred this matter to the Western District of Washington.  (*See* Dkt. # 18.)  Thus, if the court decides not to exercise its discretion to retain jurisdiction over Wow's counterclaims, the court's only option is to dismiss the counterclaims without prejudice to re-filing in the appropriate state court.